UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 16-20595-CIV-SEITZ/TURNOFF

BRUCE J. SIMPSON,

    Plaintiff,

v.

ROYAL CARIBBEAN CRUISES LTD.

    Defendant.

_____/

**PLAINTIFFS' FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

    Plaintiffs, Bruce J. Simpson, Joseph M. Grossman, Elayne Loeser, Fredy Loeser, Stacy Eastman, Anthony Sansone, and Louise Sansone, through the undersigned counsel, hereby sue Defendant, Royal Caribbean Cruises Ltd., and allege the following:

**PARTIES**

    1.    Plaintiff, Bruce J. Simpson, is a resident of Delaware.

    2.    Plaintiff, Joseph M. Grossman, is a resident of New York.

    3.    Plaintiff, Elayne Loeser, is a resident of New York.

    4.    Plaintiff, Fredy Loeser, is a resident of New York.

    5.    Plaintiff, Stacy Eastman, is a resident of New York.

    6.    Plaintiff, Anthony Sansone, is a resident of New Jersey.

    7.    Plaintiff, Louise Sansone, is a resident of New Jersey.

    8.    Defendant, Royal Caribbean Cruises Ltd. (hereinafter "Royal Caribbean") is a Liberian Corporation with its principal place of business in Miami, Florida. Royal Caribbean

maintains its principal place of business at 1050 Caribbean Way, Miami, Florida 33132. Royal Caribbean owns and operates the cruise ship *Anthem of the Seas*.

## JURISDICTION AND VENUE

9. The Court has jurisdiction over this matter pursuant to 28 U.S.C.A. § 1332 because the amount in controversy exceeds the sum or value of seventy-five thousand dollars ($75,000.00), exclusive of interest and costs, and there is complete diversity between the parties hereto. The Court also has jurisdiction over this matter because the causes of action asserted herein arise under 28 U.S.C. § 1333 and the General Maritime Laws of the United States.

10. The Court has jurisdiction over Royal Caribbean pursuant to Florida Statutes § 48.193 because (a) Royal Caribbean is engaged in substantial and not isolated business activity within this state, and routinely operates in the waters of this state; (b) the causes of action set forth herein arise from Royal Caribbean, personally and/or through its agents, operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state; and (c) the causes of action set forth herein arise from Royal Caribbean, personally and/or through its agents, committing tortious acts in whole or in part within this state.

11. Venue is proper in this Court because Royal Caribbean's principal place of business is within Miami-Dade County, and a substantial part of the events or omissions giving rise to the causes of action set forth herein occurred within the county. The cruise line ticket at issue also requires that suit be brought in this Court.

12. Royal Caribbean may be served with this Complaint under Florida Statutes §§ 48.081, 48.091, 48.181, 607.1501 and/or 607.1507.

## **PRELIMINARY ALLEGATIONS**

13. Royal Caribbean owned, operated, managed, maintained, and/or controlled the *Anthem of the Seas*, including the Captain, officers, crew, and medical personnel, equipment, and facilities on board.

14. Royal Caribbean was aware of the storm off the Atlantic coast but nevertheless chose to send the *Anthem of the Seas* out directly into the storm. This conscious decision placed all of the passengers and crew of the *Anthem of the Seas* at serious risk.

15. The crew of the *Anthem of the Seas*, including its Captain, officers, and medical personnel, were in regular, full-time employment of the Royal Caribbean and/or the ship, as salaried crew members, subject to the ship's discipline and the master's orders. They were also subject to the control of Royal Caribbean's shore-side operations located in Miami, Florida.

16. Royal Caribbean had the right to hire and fire its crew.

17. Royal Caribbean is directly responsible and liable for its actions and the actions of its crew, including the Captain, for choosing to sail into a hurricane-force storm.

18. Royal Caribbean is directly responsible and liable for its actions and the actions of its crew, including the medical personnel on board, for the lack of treatment of Plaintiffs. Royal Caribbean is also liable under a theory of *respondeat superior* and/or apparent agency.

19. The Captain, officers, and crew were employees and/or actual agents and/or apparent agents of Royal Caribbean, and acted within the course and scope of their employment and/or agency agreement and/or relationship.

20. The Captain, officers, and crew were represented to Plaintiffs and the ship's passengers as employees of Royal Caribbean through signs, documents, and uniforms. The Captain, officers, and crew were also paid by Royal Caribbean. Royal Caribbean knew that the

Captain, officers, and crew represented themselves to be employees of Royal Caribbean and allowed them to represent themselves as such. Plaintiffs detrimentally relied on these representations and proceeded on a cruise in which they were severely injured.

## GENERAL FACTS

21.     On February 6, 2016, Plaintiffs boarded the Royal Caribbean *Anthem of the Seas* for a cruise from New Jersey to Florida, the Bahamas, and back. Plaintiffs were paying passengers.

22.     In the days prior to the *Anthem of the Seas'* departure, multiple weather forecasters and meteorologists predicted a serious storm off the Atlantic coast. The storm was predicted to have up to hurricane potential.

23.     Despite knowing about the serious storm, Royal Caribbean decided to send the *Anthem of the Seas* out into the Atlantic Ocean, placing Plaintiffs, and the rest of the passengers and crew, in grave danger.

24.     The *Anthem of the Seas'* previous two cruises out of New Jersey were delayed because of weather, and Royal Caribbean did not want to delay a third cruise.

25.     On the morning of February 7, 2016, the first full day of the cruise, the storm began.

26.     At around 2:00 p.m. on February 7, 2016, the storm became so severe that the Captain ordered all passengers to stay in their rooms for safety. Despite this order—and the obvious danger the passengers and crew were in—Royal Caribbean sailed the *Anthem of the Seas* farther into the storm.

27.     There were no life jackets in the Plaintiffs' rooms.

28.     While confined to their rooms, the Captain repeatedly told the passengers that the ship was in contact with Royal Caribbean's main offices in Miami as well as the Coast Guard. Only later did Plaintiffs discover that the ship was not in contact with the Coast Guard. Instead,

the Coast Guard reached out to the *Anthem of the Seas* after seeing the social media posts of the *Anthem of the Seas*' passengers during the storm.

29.     The storm progressively worsened. The ship was tossed about by 10-, 20-, and even 30-foot waves and was battered by winds of well over 100 miles per hour. *See* Ex. A (photograph of the waves). The Captain repeatedly informed the passengers that the winds were hitting 160-180 miles per hour. The storm was so powerful that the *Anthem of the Seas*—a 1,141-foot-long ship weighing over 160,000 tons—pitched back and forth, sometimes tipping at a 45-degree angle.

30.     The storm continued for hours.

31.     Plaintiffs endured the rest of the night, without access, or with severely limited access, to food, while the *Anthem of the Seas* continued to sail into the storm.

32.     Later that day, the Captain announced to the passengers that the past 24-36 hours was the worst sea conditions he had seen in his entire career. The Captain then told the passengers that the ship had detected another storm outside of Jacksonville, Florida, and to avoid this second storm, the Anthem of the Seas would be returning to New Jersey.

33.     The *Anthem of the Seas* was seriously damaged in the storm. *See* Ex. B (photographs of the damage to the ship). It was later discovered that one of the *Anthem of the Seas* main engines was damaged during the storm.

34.     On February 10, 2016, the *Anthem of the Seas* docked in New Jersey around 6:00 p.m., but the passengers weren't allowed to disembark until roughly 9:00 p.m.

## FACTS SPECIFIC TO BRUCE SIMPSON

35.     On February 6, 2016, Bruce Simpson and his husband boarded the *Anthem of the Seas* for a cruise from New Jersey to Florida, the Bahamas, and back.

36.     While Simpson and his husband were confined to their room for safety, the *Anthem of the Seas* began to rock and tilt violently. Everything that wasn't bolted to the floor in Simpson's

room was moving. Simpson was holding onto the bed, and his husband was holding onto the couch in their room.

37. Eventually, Simpson needed to use the restroom. He stood up from the bed to make his way to the restroom, but as soon as he stood up, the ship pitched violently, flinging Simpson nearly 18 feet, from the edge of his bed, head first into the exit door of his room. Simpson was hurled across the room with such force that he was knocked unconscious.

38. Simpson's husband saw that Simpson flew into the door with such speed that Simpson crumpled to the floor, completely unconscious.

39. Simpson was especially at risk when he was thrown through the air and against the door because he has two aneurisms. If the door handle hit one of his two aneurisms (one above Simpson's heart and the other in Simpson's abdomen), Simpson would have bled to death in minutes.

40. As soon as Simpson was thrown against the door, Simpson's husband rushed to Simpson to prevent further injuries. Simpson's husbanded attended to Simpson until Simpson regained consciousness.

41. As a result of being flung against the door of his room, Simpson was injured. He had a concussion, his left eye was bruised, his wrist was sprained or broken, his neck was stiff and painful, and his ribs and torso were bruised and hurting. The force of being thrown nearly 18 feet into a door caused Simpson significant injury.

42. After Simpson was injured, his husband dialed "0" on the room's phone to seek medical attention for Simpson. Simpson's husband was told to dial "911"—Royal Caribbean's internal emergency number—so that he could speak to someone in medical. Simpson's husband dialed "911" and was connected with medical. However, Simpson's husband was told that the

medical team was attending to other injured passengers at that time and that as long as Simpson was still breathing and not bleeding, he should wait until the storm calmed down to seek further medical attention.

43.     Simpson and his husband endured the rest of the night, and the *Anthem of the Seas* continued to sail into the storm.

44.     The next morning, Simpson went to seek medical attention from the medical office onboard the *Anthem of the Seas*. When Simpson arrived there, he found that the medical office was closed until later that afternoon. Simpson returned to his room and called Royal Caribbean to open the medical office so he could receive treatment for his injuries. A few minutes later, an announcement was made that the medical office would be opening immediately.

45.     Simpson made his way back to the medical office, only to find the office crowded with other injured passengers. Some were in wheelchairs and others had their arms in slings.

46.     Simpson again waited to receive treatment for his injuries. While he waited, Simpson filled out an accident report, which he submitted to Royal Caribbean.

47.     Simpson eventually was seen by the onboard physician. Simpson was told that he didn't have any life-threatening injuries, but that he should watch for specific signs and symptoms of a slow brain bleed due to the force by which Simpson was hurled against the door of his room. The physician also put together a report of Simpson's injuries.

48.     However, the physician was unable to determine if Simpson had broken his hand, wrist, or ribs because the X-Ray machine was damaged during the storm.

49.     Despite the serious nature of his injuries, Royal Caribbean never followed up with Simpson about his injuries. Not while Simpson was onboard the *Anthem of the Seas*, and not once Simpson returned home.

## FACTS SPECIFIC TO JOSEPH GROSSMAN

50. On February 6, 2016, Joseph Grossman, his 37-year-old daughter, his 80-year-old mother, and his step father, also boarded the *Anthem of the Seas* for a cruise from New Jersey to Florida, the Bahamas, and back.

51. Grossman and his daughter shared a room with a balcony. Grossman's mother and his step father were in a separate room.

52. Grossman and his daughter slept on separate beds in their room. Grossman's bed was flush with the bulkhead near the bathroom, and Grossman's daughter's bed was near the doors to the balcony.

53. Grossman, who is a licensed coast guard charter captain, saw that the meteorologists predicted a severe storm in the days leading up to the cruise. However, Grossman trusted his and his family's well being to Royal Caribbean's judgment, assuming that Royal Caribbean would cancel or delay the cruise if the storm was bad enough to endanger the passengers.

54. While Grossman and his family were confined to their rooms for safety, the *Anthem of the Seas* began to rock and tilt violently. Everything that wasn't bolted to the floor in Grossman's room was moving.

55. Royal Caribbean had placed a bottle of champagne and some glasses in Grossman's room. As soon as the storm hit, the bottle and glasses flew across the room and shattered against the wall. Grossman's room was full of broken glass. Fortunately, neither Grossman nor his daughter were cut by the glass, but they had to wear shoes in their room for the duration of the trip and found slivers of glass through the rest of the cruise.

56. While the boat was violently listing, Grossman and his daughter were laying face-down on their beds, holding tightly so they wouldn't fall across the room or fall into the broken glass covering the floor of their room.

57. As Grossman was holding onto his bed, he was repeatedly slammed against the bulkhead that his bed was sitting next to. Although Grossman was seriously injured from repeatedly hitting his head and shoulder on the bulkhead, he could not let go or he would risk falling into the broken glass on the floor, or being thrown across the room.

58. Now, even weeks after the cruise, and after beginning treatment, Grossman has severely limited movement in his neck and is regularly woken up at night by pain from his injured shoulder.

59. During the storm, the *Anthem of the Seas* listed to such an extreme degree that Grossman's daughter's dress, which was hanging vertically in their shared room, repeatedly swung to nearly horizontal positions.

## FACTS SPECIFIC TO ELAYNE AND FREDY LOESER

60. On February 6, 2016, Elayne Loeser and her husband Fredy Loeser also boarded the *Anthem of the Seas* for a cruise from New Jersey to Florida, the Bahamas, and back.

61. Elayne Loeser was 71 years old on the date of the cruise, and her husband, Fredy, was 72.

62. The Loesers have been on many cruises. As part of their status with Royal Caribbean, their room was stocked with a bottle of champagne as well as a few glasses to go with it.

63. After the Loesers were confined to their room, the *Anthem of the Seas* began to rock and tilt violently.

64. Fredy Loeser is a diabetic.

65. As the rocking of the ship became increasingly violent, Elayne Loeser stood up from the bed, where she and her husband were holding on, to reach for Fredy's insulin.

66. As Elayne stood up, the bottle of champagne and glasses were thrown into the wall. The glass smashed and hit Elayne in the face. Fortunately, she was not cut but had broken glass in her face, eyelashes, and hair.

67. As the ship continued to rock, one of the drawers of the dresser in the Loesers rooms suddenly slid open. The drawer hit Elayne in the head, cutting her.

68. As the night went on, Fredy's blood sugar increasingly dropped.

69. The Loesers tried calling for help using their in-room phone, but were unable to reach anyone.

70. The Loesers then used their cell phone to call their son, a physician.

71. Their son told them that they needed to get sugar for Fredy.

72. The Loesers were unable to get any sugars for Fredy until the next day when the storm stopped.

73. Fredy Loeser has been unable to get his blood sugar to return to normal since the cruise. As a result, he is now in the process of seeing a specialist.

## FACTS SPECIFIC TO STACY EASTMAN

74. On February 6, 2016, Stacy Eastman and her husband also boarded the *Anthem of the Seas* for a cruise from New Jersey to Florida, the Bahamas, and back.

75. After Eastman and her husband were confined to their room, the *Anthem of the Seas* began to rock and tilt violently.

76. While confined to their room, Eastman needed to use the restroom. While she was in the restroom, the ship rocked violently and the shower door suddenly swung open striking Eastman in the forearm. It bruised and scratched or cut her arm.

77. Eastman and her husband were in a room with a balcony.

78. Later that night, the ship began to rock so violently that the door to the balcony opened, exposing Eastman and her husband to the storm. This was particularly alarming given that the ship was rocking at nearly a 45-degree angle, and there were no life jackets in Eastman's room.

79. Eventually, Eastman's husband was able to close the door to the balcony.

80. Eastman is also a diabetic.

81. Eastman was forced to endure hours in her room without food while her blood sugar increasingly dropped.

82. As a result of the cruise, Eastman was diagnosed with post traumatic stress disorder.

83. Eastman is currently seeking treatment for her injuries.

### FACTS SPECIFIC TO ANTHONY AND LOUISE SANSONE

84. On February 6, 2016, Plaintiff Anthony Sansone and his wife, Plaintiff Louise Sansone, also boarded the *Anthem of the Seas* for a cruise from New Jersey to Florida, the Bahamas, and back.

85. Anthony and Louise were 68 years old at the time of the cruise.

86. The Sansones have been on many cruises, in fact, the *Anthem of the Seas* cruise was complimentary. Their room was located on the eighth floor towards the front of the ship.

87. While the Sansones were confined to their room for safety, the *Anthem of the Seas* began to rock and tilt violently.

88. Later that night, the ship began to rock so violently that the Sansones were thrown off their bed. Items from one side of the room smashed into the other side, and there was broken glass everywhere. Their room was also flooded with 3-4 inches of water during the storm.

89. The Sansones were fearful for their lives. They were particularly alarmed given that the ship was rocking at nearly a 45-degree angle, and there were no life jackets in Eastman's room. The Sansones even said "good-bye" to each other, thinking that they would not survive.

90. As a result of the ship's violent rocking, Louise sustained physical injuries – her body and her eye were badly bruised.

91. After they got off the ship, Anthony began suffering from anxiety attacks. Anthony sought medical treatment with a cardiologist, and was admitted to the Community Medical Center in Toms River, New Jersey for what was thought to be a heart attack.

## COUNT 1: NEGLIGENCE

Plaintiffs re-allege and incorporate by reference paragraphs 1-91 of this Complaint.

92. Plaintiffs were injured due to the fault and negligence of Royal Caribbean and/or its employees, agents, apparent agents, or servants as follows:

   a. Failure to supervise its crew;

   b. Failure to properly train its crew;

   c. Failure to provide adequate crew;

   d. Failure to safely operate the vessel;

   e. Operating the vessel in an improper and unsafe manner;

   f. Failure to maintain the vessel;

   g. Failure to employ an adequately trained captain;

   h. Failure to recognize, heed, or acknowledge multiple warnings of severe weather off the Atlantic coast;

   i. Failure to warn or protect Plaintiff from the severe weather off the Atlantic coast;

   j. Failure to timely divert the ship to avoid the severe weather;

    k.   Failure to disclose to passengers that the *Anthem of the Seas* was sailing into a dangerous and growing storm;

    l.   Failure to provide life preservers in Plaintiffs' rooms;

    m.   Negligent hiring and retention of the ship's crew, including but not limited to the captain, other officers, and any employees responsible for the decision to proceed into the storm; and

    n.   Failure to develop and institute adequate procedures and policies to address these hazards.

93.    Royal Caribbean knew of these conditions and failures, but failed to correct them prior to the incident that injured Plaintiffs. These conditions and failures were longstanding and obvious to Royal Caribbean, leaving no doubt that Royal Caribbean either knew or should have known about them.

94.    Royal Caribbean knew or should have known that the storm was approaching when it chose to set sail. Despite this knowledge, Royal Caribbean proceeded into the storm putting profits ahead of the safety of its passengers.

95.    At all times, the *Anthem of the Seas* was unseaworthy for the reasons stated above.

96.    Defendant is also liable as a matter of law because of its violations of Coast Guard regulations. As such, Plaintiffs maintain negligence *per se* claims against Defendant

97.    Given the ease with which this terrible incident could have been prevented, and Royal Caribbean's actual knowledge of the dangers related to sailing into a hurricane-force storm, Royal Caribbean's conduct was wanton, willful, and/or outrageous, and entitles Plaintiffs to punitive damages.

98.     As a direct and proximate result of Royal Caribbean's conduct, Plaintiffs suffered serious injuries.

99.     Plaintiffs have suffered the following damages as a result of Royal Caribbean's negligence:

a.  Physical injury to Plaintiffs' bodies

b.  Physical pain and suffering

c.  Mental and emotional anguish;

d.  Loss of enjoyment of life;

e.  Disability;

f.  Impairment;

g.  Inconvenience in the normal pursuits and pleasures of life;

h.  Economic Insecurity;

i.  Medical Expenses in the past and future; and

j.  Physical handicap

100.    Plaintiffs seek recovery of these damages and all others recoverable under general maritime law, as well as a trial by jury.

### COUNT 2: NEGLIGENCE AGAINST ROYAL CARIBBEAN FOR THE ACTS OF ITS PERSONNEL BASED ON VICARIOUS LIABILITY UNDER *RESPONDEAT SUPERIOR*

Plaintiffs re-allege and incorporate by reference paragraphs 1-91 of this Complaint.

101.    On or about February 7, 8 and 9 of 2016, the *Anthem of the Seas*' Captain and crew made decisions about whether to sail, or continue sailing, into the storm.

102.    They were the employees of Royal Caribbean, or were Royal Caribbean's agents, apparent agents, and/or servants.

103. They were subject to the right of control by Royal Caribbean.

104. They were acting within the scope of their employment or agency.

105. Royal Caribbean acknowledged that the crew, officers, and Captain would act on Royal Caribbean's behalf, and they accepted the undertaking.

106. Royal Caribbean is vicariously liable for the acts of the Captain, officers, and crew, as set forth in the Preliminary Allegations, Facts, and Count 1 above. Those acts proximately caused Plaintiffs' injuries and damages.

107. Plaintiffs have suffered the following damages as a result of the negligence of Royal Caribbean's personnel, for whom Royal Caribbean is vicariously liable:

   a. Physical injury to Plaintiffs' bodies

   b. Physical pain and suffering

   c. Mental and emotional anguish;

   d. Loss of enjoyment of life;

   e. Disability;

   f. Impairment;

   g. Inconvenience in the normal pursuits and pleasures of life;

   h. Economic Insecurity;

   i. Medical expenses in the past and future; and

   j. Physical handicap.

108. Plaintiffs seek recovery of these damages and all others recoverable under general maritime law, as well as a trial by jury.

### COUNT 3: NEGLIGENCE AGAINST ROYAL CARIBBEAN FOR THE ACTS OF ITS PERSONNEL BASED ON VICARIOUS LIABILITY UNDER APPARENT AGENCY

Plaintiffs re-allege and incorporate by reference paragraphs 1-91 of this Complaint.

109. On or about February 7, 8, and 9 of 2016, the *Anthem of the Seas*' Captain, officers, and crew made decisions about whether to sail, or continue sailing, into the storm.

110. They were represented to Plaintiffs as the employees, agents, apparent agents, or servants of Royal Caribbean.

111. They were subject to the right of control by Royal Caribbean.

112. They wore Royal Caribbean insignia and disseminated documents with the Royal Caribbean insignia. They commanded and controlled the *Anthem of the Seas* and spoke and acted as though they were authorized to do so by Royal Caribbean. Royal Caribbean never took any actions to indicated that they were not Royal Caribbean's agents.

113. They were acting within the scope of their employment or agency.

114. Royal Caribbean acknowledged that the Captain, officers, and crew would act on Royal Caribbean's behalf, and thereby affirmed the Captain's, officers', and crew's agency representations.

115. Royal Caribbean is vicariously liable for the acts of the Captain, officers, and crew, as set forth in the Preliminary Allegations, Facts, and Count 1 above. Those acts proximately caused Plaintiffs' injuries and damages.

116. Plaintiffs have suffered the following damages as a result of the negligence of Royal Caribbean's personnel, for whom Royal Caribbean is vicariously liable:

    a. Physical injury to Plaintiffs' bodies

    b. Physical pain and suffering

    c. Mental and emotional anguish;

    d. Loss of enjoyment of life;

    e. Disability;

  f. Impairment;

  g. Inconvenience in the normal pursuits and pleasures of life;

  h. Economic Insecurity;

  i. Medical expenses in the past and future; and

  j. Physical handicap

117. Plaintiffs seek recovery of these damages and all others recoverable under general maritime law, as well as a trial by jury.

WHEREFORE Plaintiffs, Bruce J. Simpson, Joseph M. Grossman, Elayne Loeser, Fredy Loeser, Stacy Eastman, Anthony Sansone, and Louise Sansone respectfully request that this Court enter judgment against Defendant, Royal Caribbean Cruises Ltd., for compensatory damages, punitive damages, interest, court costs, and all other relief recoverable under general maritime law or as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all claims set forth herein.

      Respectfully submitted,

      /s/ Scott P. Schlesinger
      **SCHLESINGER LAW OFFICES, P.A.**
      Scott P. Schlesinger, Esq.
      Florida Bar No. 444952
      scott@schlesingerlaw.com
      Jonathan R. Gdanski, Esq.
      Florida Bar No. 0032097
      jonathan@schlesingerlawoffices.com
      Jeffrey L. Haberman, Esq.
      jhaberman@schlesingerlaw.com
      1212 S.E. 3rd Avenue
      Fort Lauderdale, FL 33316
      Telephone: 954.467.8800
      Facsimile: 954.320.9509

      -and-

>Kurt B. Arnold — *Pro-Hac Vice*
>Texas Bar No.: 24036150
>karnold@arnolditkin.com
>Jason A. Itkin — *Pro-Hac Vice*
>Texas Bar No.: 24032461
>jitkin@arnolditkin.com
>Caj. D. Boatright — *Pro-Hac Vice*
>Texas Bar No.: 24036237
>cboatright@arnolditkin.com
>**ARNOLD & ITKIN LLP**
>6009 Memorial Drive
>Houston, Texas 77007
>Telephone: 713.222.3800
>Facsimile: 713.222.3850
>*ATTORNEYS FOR PLAINTIFFS*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th day of March, 2016, I served the foregoing on all counsel of record via transmission of the Notices of Electronic Filing generated by CM/ECF.

>Respectfully submitted,
>
>/s/ Scott P. Schlesinger
>**SCHLESINGER LAW OFFICES, P.A.**